## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

UNITED STATES OF AMERICA,

v.                                                           CASE NO.: 4:22-cr-16-1

SHAQUANDRA WOODS,

Defendant.

## O R D E R

This matter is before the Court on Defendant Shaquandra Woods' Motion Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure to Vacate Defendant's Conviction. (Doc. 356.)  Defendant contends that the Government presented insufficient evidence to support the jury's verdict that she is guilty of engaging in a conspiracy to commit wire fraud.  This contention strains credulity.  The jury heard and saw copious evidence that Defendant conspired to submit fraudulent loan applications to obtain money intended to help small businesses weather the COVID-19 pandemic.  The Court **DENIES** Defendant's Motion.

## BACKGROUND

Through the Second Superseding Indictment, the Grand Jury charged Defendant with one count of conspiracy to engage in wire fraud in violation of 18 U.S.C. § 1349.  (Doc. 222.)  The charge alleged that Defendant and her coconspirators agreed "to obtain monies and funds owned by and under the custody and control of the Small Business Administration by means of false and fraudulent pretenses, representations and promises."  (Id.)

During a four-day trial, the jury heard and saw evidence that Defendant, an attorney, worked with others to prepare and submit a series of fraudulent applications for Economic Injury

Disaster Loans ("EIDL") and Paycheck Protection Program ("PPP") loans.   These loan applications were submitted during the COVID-19 pandemic and sought to obtain funds made available through the United States Small Business Administration ["SBA"] to lessen the pandemic's economic devastation.   Dozens of documentary exhibits and multiple witnesses connected Defendant to twelve loan applications.[1]   Throughout 2020, Defendant submitted four applications for EIDLs for businesses she solely owned:

- S.A. Woods Law, PLLC, (Gov. Tr. Ex. 2),[2]

- EZE Trace, LLC, (Gov. Tr. Ex. 3),

- EZ Legal Solutions, LLC, (Gov Tr. Ex. 5), and

- S.A. Woods Enterprise, LLC, (Gov Tr. Ex. 57).

She also submitted at least three PPP loan applications for her businesses:

- S.A. Woods Enterprise, LLC, (Gov Tr. Ex. 58),

- EZ Trace, LLC, (doc. 333, pp. 216–17), and

- S.A. Woods Law, PLLC (id. at pp. 217–18).

The Government also introduced proof that, from June to October 2020, Defendant helped submit at least five fraudulent EIDL applications for her friends' and family members' businesses:

- COVID Trucking, LLC, a business owned by her husband, Quentin Bostick, Sr., (Gov. Tr. Ex. 16),

- Actually Living Life Management Consulting, LLC, a business owned by her friend Cleopatra Smith, (Gov. Tr. Ex. 54),

- D'Evils Limited Co., a business owned by her husband's nephew Jeremial Coleman, (Gov. Tr. Ex. 60),

---

[1]  The Court refers to the businesses listed on these twelve applications as the "applicant businesses."

[2]  The Government conceded that Defendant made no fraudulent representations on this application. (Doc. 333, p. 190.)

- Defendant's cousin Kenneth Jackson's unincorporated sole proprietorship, (Gov. Tr. Ex. 29), and

- Defendant's friend Courtney Gilchrist's unincorporated sole proprietorship, (Gov. Tr. Ex. 37).

The trial evidence showed that Defendant falsely claimed many of the applicant businesses were in operation before the pandemic to give the appearance that they met the loan programs' timing requirements. To be eligible for an EIDL, a business had to be in operation before January 31, 2020. (Doc. 333, pp. 136, 229.) The PPP program required that a business had been in operation before February 15, 2020. (See Gov. Tr. Ex. 58, p. 13.) Most of the applicant businesses did not operate before those dates. Thus, Defendant and her coconspirators created the businesses after the pandemic and then falsified the businesses' origination dates in their applications.

Additionally, the jury heard evidence that Defendant wildly inflated the applicant businesses' incomes to obtain the largest loans available. An EIDL applicant could receive a loan for up to half of the business's net revenue for calendar year 2019, and the maximum EIDL amount was $150,000. (Doc. 333, pp. 136–37.) After submitting a legitimate EIDL application for S.A. Woods Law, PLLC, which accurately stated the business's 2019 income, Defendant was dissatisfied with the amount of the loan. (Gov. Tr. Ex. 2, p. 10.) On future EIDL applications, Defendant represented that each of the applicant businesses made in the ballpark of $300,000. The businesses of Defendant, her friends, and her family members did not coincidentally all make the same amount of money. Rather, as Defendant and her coconspirator Ashlee Parker discussed, they "ha[d] to put $300,000 as revenue to get $150,000." (Gov. Tr. Ex. 46, p. 13; see also Gov. Tr. Ex. 48, p. 6 (Defendant telling Gilchrist that the stated income of $330,000 on Gilchrist's application was "the number we had to put down to get to the 150").) While the Government's evidence focused on the falsified EIDL applications, the jury also heard evidence that, as part of the conspiracy, Defendant made fraudulent representations in support of her PPP applications by

lying about the origination date of one of her businesses and falsifying the income of all three businesses.

To make matters worse, when the SBA or loan program administrators asked Defendant and her conspirators for documentation to verify the bogus information on their loan applications, they concocted and submitted fraudulent documents.  The jury saw those fabricated documents, including bank statements and tax records, as well as evidence, including Defendant's own communications and payment records, that tied her to the fabrications.

The jury convicted Defendant of the sole count against her.  (Doc. 324.)  In her Motion, Defendant acknowledges that "the Government presented several witnesses to show Ms. Woods submitted EIDL loan applications with false income reports and attached falsified documents to support those false incomes."  (Doc. 356, p. 2.)  She also concedes that "a number of witnesses [] testified they engaged in fraud in concert with [Defendant.]"  (Id. at p. 3.)  Then, in stark contrast to these concessions, Defendant argues that "the evidence adduced at trial was insufficient to sustain a conviction."  (Id. at p. 6.)  The Government asserts that "Defendant's argument overlooks the significant evidence introduced at trial connecting her to fraudulent EIDL and [PPP] applications."  (Doc. 360, p. 3.)  Defendant stands by her Motion in her Reply and attempts to rebut the Government's arguments.  (Doc. 368.)

## STANDARD OF REVIEW

A motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant."  United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994).  In considering a motion for judgment of acquittal, the Court "view[s] the evidence in the light most favorable to the verdict."  United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989).  Moreover, "the court must assume the truth of the

Government's evidence." United States v. Pate, No. CR118-008, 2019 WL 1244722, at *3 (S.D. Ga Mar. 18, 2019) (citing United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985)).  The issue before the Court is "whether, viewing all the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. at * 2 (citing United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987)).  Put another way, the verdict must stand "unless no trier of fact could have found guilt beyond a reasonable doubt." United States v. Lyons, 53 F.3d 1198, 1202 (11th Cir. 1995).

"Under Federal Rule of Criminal Procedure 33(a), 'the court may vacate any judgment and grant a new trial if the interest of justice so requires.'" United States v. Pitts, No. CR4:19-12, 2019 WL 3408817, at *1 (S.D. Ga. July 26, 2019).  Yet courts should grant new trials "sparingly and with caution, doing so only in those really exceptional cases." Martinez, 763 F.2d at 1313 (citation and quotes omitted).  Granting a new trial based on insufficiency of the evidence is an extraordinary remedy that courts seldom employ.  As the United States Court of Appeals for the Eleventh Circuit explained:

> On a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict.  It may weigh the evidence and consider the credibility of the witnesses.  United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980); United States v. Simms, 508 F. Supp. 1188, 1202 (W.D. La. 1980).  If the court concludes that, 'despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.' Lincoln, 630 F.2d at 1319. . . . While the district court's discretion is quite broad, there are limits to it.  The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.  Simms, 508 F. Supp. at 1202.

Id. at 1312–13.

**DISCUSSION**

This case is by no measure one of those "exceptional cases" where the evidence "preponderates heavily against the verdict."  The jury heard and saw a plethora of evidence that Defendant and her coconspirators submitted eleven fraudulent loan applications to obtain funds designed to help small businesses devastated by the COVID-19 pandemic.  The evidence of one of these sham applications was enough to sustain Defendant's conviction.  Much more, proof of the eleven applications in the aggregate created a mountain of evidence that Defendant participated in an extensive scheme to defraud the United States.  The Government introduced damning documents that demonstrated the applications' falsity, Defendant's knowing participation in each fraudulent application, and the modus operandi of Defendant and her coconspirators.  To buttress the documentary evidence, the Government also presented multiple witnesses including Defendant's coconspirators, Cleopatra Smith, Courtney Gilchrist, Amber Childers, and Ashlee Parker who, as Defendant herself puts it, "testified they engaged in fraud in concert with [Defendant]."  (Doc. 356, p. 3.)

In her Motion and Reply, Defendant repeatedly argues that her coconspirators' testimony was unreliable and that there is no other evidence of her guilt.  The trial record belies Defendant's protestations.  Indeed, her own Motion lists categories of exhibits that support her coconspirator's testimony.  (Id. at pp. 2–3.)  The Government details much of this evidence in its Response.  (Doc. 360, pp. 2–25.)  In this Order, the Court does not recount all the incriminating evidence against Defendant.  Instead, the Court addresses contentions raised by Defendant's Motion and cites several illustrative pieces of evidence.  It should not be presumed from the Court's non-exhaustive approach that the jury only heard thin proof of Defendant's guilt.  To the contrary,

Defendant and her coconspirators left an extensive paper trail of their fraud.  Thus, an exhaustive list of the Government's proof would extend far beyond present needs.

I.      **The Government Introduced Sufficient Evidence that the Loan Applications and Supporting Materials Were Fallacious and that Defendant Knew of their Falsity.**

The loan applications and supporting documentation undoubtedly contained materially false representations.  Possibly the most obvious and dumbfounding proof of falsity is that one application claimed that a business named "COVID Trucking, LLC" had been in operation since 2001.  (Gov. Tr. Ex. 16, pp. 1–2.)  Other examples of the conspirators' deceit are less obvious but still patent.

For instance, in support of her EIDL application for EZ Legal Solutions, Defendant represented to the SBA that she filed articles of organization for the business in 2019 even though the State of Florida's records prove she did not file the articles until 2020.   A representative of the SBA requested that Defendant submit documentation that EZ Legal Solutions, LLC, existed prior to 2020.  (Gov. Tr. Ex. 10, pp. 1–2.)  In response, Defendant emailed the SBA an operating agreement for "EZE Legal Solutions, LLC," which she admits she created and signed.[3]  (Id. at pp. 1, 3–8; Gov. Tr. Ex. 5, pp. 32–37; doc. 336, pp. 126–30.)  In that operating agreement, Defendant stated that she "has formed an [sic] Florida Limited Liability Company named EZE LEGAL SOLUTIONS, LLC by filing the Articles of Organization with the office in the State of Florida on February 1, 2019." (Gov. Tr. Ex. 10, p. 1.)  But the State of Florida's records reveal that Defendant did not file the articles of organization until June 16, 2020.  (Gov. Tr. Ex. 9.)  Even Defendant

---

[3]  Defendant's EIDL application called her business "EZ Legal Solutions, LLC," (Gov. Tr. Ex. 5, p. 1), while her operating agreement called the business "EZE Legal Solutions, LLC," (id. at p. 32).   Throughout her testimony and the documents she submitted to the SBA, Defendant confused the names, dates, and other specifics of her various businesses.  As Mark Twain reportedly said, "[i]f you tell the truth, you don't have to remember anything."

testified that she never filed any document, much less articles of organization, as to EZ Legal

Solutions before 2020.[4]  (Doc. 336, pp. 126–29.)  When asked whether her statement to the SBA

that she filed articles of organization for EZ Legal Solution with the State of Florida on February

1, 2019, was untrue, Defendant waffled to the point that the Court had to tell her to answer the

question.  (Id. at p. 129.)  Even then, she continued to equivocate and stated perplexingly, "[t]hat

answer is -- according to this, that answer is incorrect."[5]  (Id.)

---

[4] Defendant argued at trial that the legal formation date of her various businesses did not matter because a business did not have to be formally established to apply for an EIDL—in other words, sole proprietorships could qualify.  (See, e.g., doc. 336, pp. 122–23.)  Defendant misses the point.  Defendant did not claim her businesses were sole proprietorships on her applications.  Rather, to give the appearance that they were legitimate companies in operation prior to the pandemic, she claimed that they were organized as limited liability companies ("LLCs") prior to 2020.  In other words, the question is not the legal status of her businesses prior to 2020.  Instead, the focus is whether Defendant told the SBA she organized her businesses as LLC's before 2020 and, if so, whether her representations were knowingly false.  Defendant clearly did and the representations clearly were.

[5] Defendant also testified that she created EZE Legal Solutions' operating agreement after speaking with the SBA.  (Doc. 336, p. 127 ("They told me to create an operating agreement."); id. at p. 128 ("They told me to create and provide an operating agreement.").)  The documentary evidence thwarts this contention.  For one, an SBA representative emailed Defendant, and approximately an hour later Defendant emailed back with the operating agreement attached.  (Gov. Tr. Ex. 10, p. 1.)  The representative's email provided numerous options for Defendant to verify her business with existing records and did not direct her to create an operating agreement.  (Id.)  Moreover, simple matters of timing prove Defendant lied to the jury on this point.  Any conversation wherein the SBA told Defendant to create an operating agreement to remedy the rejection of her application would necessarily have taken place after she submitted the application and the SBA rejected it.  Defendant submitted her EIDL application for EZ Legal Solutions on June 17, 2020.  (See Gov. Tr. Ex. 5, p. 1.)  Thus, if her story to the jury were true, her operating agreement would be dated after June 17, 2020.  However, the operating agreement she sent to the SBA claimed that it was made and entered on February 1, 2019.  (Gov. Tr. Ex. 10, p. 1.)  Therefore, Defendant lied to the jury, the SBA, or both.  Equally disproven is Defendant's testimony that she transformed her various businesses from sole proprietorships to legally formed entities at the SBA's direction after her applications came back as duplicates.  (Doc. 335, pp. 200–02.)  Defendant stood by this testimony in her Motion.  (Doc. 356, p. 14 ("Ms. Woods received information from the SBA that they were flagging her applications as duplicates, and that incorporating the other businesses would prevent the duplicate flags.").)  Defendant's own submissions to the SBA once again prove her deceit.  In support of her PPP application for S.A. Woods Enterprise, LLC, Defendant told the SBA the exact opposite of what she told the jury.  She told the SBA, "I applied for the PPP as an LLC because that is the current legal status of the business."  (Gov. Tr. Ex. 58, p. 16.)  Other documents show that Defendant legally organized her companies just before submitting loan applications, and not after speaking to the SBA about those applications being rejected.  For instance, when Defendant filed the application for "EZ Legal Solutions, LLC" she stated that the business was a "Limited Liability Company."  (Gov. Tr. Ex. 5, p. 1.)  Also, Defendant filed articles of organization for EZE Legal Solutions on June 16, 2020, (Gov. Tr. Ex. 9), the day before she submitted her EIDL application for the

Perhaps sensing the futility of vouching for the applications' veracity, Defendant now argues in her Motion that the Government failed to prove she knew of their falsity. (Doc. 356, pp. 9–10.) Her Reply depicts her as a well-meaning person "simply . . . assisting her friends with the information she was given." (Doc. 368, p. 6.) This portrayal falls flat under minimal scrutiny.

Defendant's picture omits the seven applications she submitted for her own businesses and the reams of evidence that six of those applications included false information. One obvious example is her above-described lie to the SBA that she filed articles of organization for EZ Legal Solutions in 2019. Defendant cannot plausibly claim ignorance as to when she formed her own company. There is also abundant evidence that Defendant knowingly misrepresented the date of organization and income of her other businesses. For instance, Defendant never filed a tax return or other document with the IRS in 2019 for the business S.A. Woods Enterprise, LLC. (Doc. 336, pp. 79, 81, 83.) Indeed, Defendant admitted that her own tax return for 2019 never mentioned that business. (Id. at p. 90; see also Gov. Tr. Ex. 6.) Yet in support of her PPP loan application for S.A. Woods Enterprise, LLC, Defendant submitted a 2019 IRS Schedule C tax return that Childers created for her. (Gov. Tr. Ex. 58, pp. 18–22; doc. 336, pp. 78–79.) Agent Justin Lott of the SBA testified that "this was not a legitimate Schedule C filed with the IRS." (Doc. 333, p. 220.)

It is damning enough that Defendant sent the SBA a fabricated tax return that she admits she never filed with the IRS. The contents of the Schedule C are even more incriminating. For one, the Schedule C purports to show the income of "S.A. Woods Enterprises, LLC" for 2019.[6]

---

business, (Gov. Tr. Ex. 5, p. 1). Thus, her testimony that she organized the LLC at the direction of the SBA after it rejected her business's application was patently deceitful.

[6] While Defendant's PPP and EIDL application called her business "S.A. Woods Enterprise, LLC," (Gov. Tr. Ex. 57, p. 1; Gov. Tr. Ex. 58, p. 1), the Schedule C called the business "S.A. Woods Enterprises, LLC," (Gov. Tr. Ex. 58, p. 18).

(Gov. Tr. Ex. 58, p. 18.)  That entity did not exist in 2019, because Defendant did not organize it until December 21, 2020, (id. at p. 24), eight days before submitting the business's EIDL application, (Gov. Tr. Ex. 57, p. 1).[7]  Through the Schedule C, Defendant told the SBA that "S.A. Woods Enterprises" grossed $177,000 in 2019.  (Gov. Tr. Ex. 58, p. 18.)  When asked at trial repeatedly whether the business earned that amount, Defendant characteristically danced around the question with nonsensical answers that indicated she knew it did not make that much, if any, money.  (Doc. 336, pp. 79–82.)  Agent Lott testified that Defendant did not have "any business whatsoever that made $100,000 in 2019," (doc. 333, p. 217), and that her gross revenues for that year totaled around $15,000 as she stated on her one legitimate application, (id. at p. 187).

The Government's evidence about S.A. Woods Enterprise gets even better—or worse from Defendant's perspective.  When Defendant submitted an EIDL application for the LLC, she gave the SBA a different answer for the company's 2019 revenue than she gave on the company's PPP application.  (Gov. Tr. Ex. 57, p. 1.)  On the EIDL application, she told the SBA that S.A. Woods Enterprise grossed $334,435, not $177,000 as she had said on the PPP application.  (Id.)  This falsehood fit within Defendant and Parker's scheme that they "have to put $300,000 as revenue to get $150,000."  (Gov. Tr. Ex. 46, p. 13.)  Further, the blatant inconsistency between the income Defendant claimed for her own business on two different loan applications sufficiently demonstrates her fraud.  What's more, Defendant admitted at trial—after dodging the question and being directed by the Court to answer—that she did not make $334,000 in 2019 either personally or through S.A Woods Enterprise, LLC.  (Doc. 336, p. 91.)  Her tax return for 2019 listed $15,115 as the total she received in business income.  (Gov. Tr. Ex. 6, p. 19.)  Thus, the jury had more than

---

[7]  Again, the point is not merely whether Defendant organized S.A. Woods Enterprises, LLC before the pandemic.  The point is that she misrepresented to the SBA that she had done so by submitting a sham tax return for 2019 listing the entity's formal name.

enough evidence to conclude that Defendant knowingly lied to the SBA when she stated that S.A. Woods Enterprise grossed $177,000 and $334,435 on her own loan applications.[8]

It gets even worse for Defendant.  When the SBA asked her for a bank account statement for S.A. Woods Enterprise, she first submitted a fraudulent account statement for "EZ Legal Solutions, LLC."  (See Gov. Tr. Ex. 58, pp. 13, 25–28.)  She then realized she provided the wrong fake bank statement, so she submitted another for "S.A Woods Enterprise, LLC."  (Id. at pp. 14, 29–32.)  The statement for S.A. Woods Enterprise was identical to the one Defendant had already submitted for EZ Legal Solutions except the account holder name was changed.  (Id. at pp. 25–32.)  Worse yet, the jury saw evidence that the fabricated statements Defendant submitted to the SBA for S.A. Woods Enterprise and EZ Legal Solutions were created by doctoring Defendant's S.A. Woods Law, PLLC's legitimate bank statement.  (Compare Gov. Tr. Ex. 11, pp. 51–54 with Gov. Tr. Ex. 58, pp. 25–32.)  They are replicas, including identical account balances and detailed

---

[8] On her EIDL applications for her four businesses, Defendant claimed a total annual revenue of $664,579 for 2019.  (See Gov. Tr. Ex 2; Gov. Tr. Ex. 3; Gov. Tr. Ex. 5; Gov. Tr. Ex. 57.)  This exceeds the annual revenue claimed on her legitimate tax return by $649,464.  (See Gov. Tr. Ex. 6, p. 19.)  When pressed at trial about the discrepancies in her income, Defendant gave nonsensical answers ranging from blaming Childers as her "tax advisor," reasoning that she could say that each business made over $300,000 in 2019 because she made that much money personally in 2020, and claiming that S.A. Woods Enterprise was a "parent company."  (Doc. 336, pp. 80–82, 115–17, 130–31.)  Defendant even claimed that she could substantiate her personal income based on the balance of her "IOLTA account."  (Id. at pp. 115–16.)  "IOLTA stands for 'Interest on Lawyer Trust Account.'  An IOLTA account is used to deposit client funds that are nominal or to be held for a short period of time.  Funds in an IOLTA account are the property of the client and not the lawyer."  United States v. Detling, No. 118CR00309LMMLTW1, 2019 WL 3006623, at *2 (N.D. Ga. Apr. 30, 2019), report and recommendation adopted, No. 1:18-CR-309-LMM-LTW, 2019 WL 2284726 (N.D. Ga. May 29, 2019) (internal citations omitted); see also GA Bar Rule 4-102, Ga. Rules of Professional Conduct Rule 1.15(II) ("No personal funds shall ever be deposited in a lawyer's trust account, except that unearned lawyer's fees may be so held until the same are earned.").  Defendant at least eventually admitted that EZ Legal Solutions did not make $300,000 in 2020 and that she told the SBA that it did.  (Id. at pp. 130–31.)  In any case, Defendant's convoluted attempts at explanations made no sense and her testimony only gave more proof that she falsified her businesses' income amounts.

transaction descriptions, except for the names of the account holders and dates.[9]  These obvious

fabrications epitomize the slipshod fraudulence in Defendant's businesses' loan applications.

Even putting Defendant's own businesses aside, the jury heard a plethora of evidence that

Defendant knowingly contributed to five fraudulent EIDL applications for her family's and

friends' businesses.  The Court summarizes that evidence in Section II below.  But one piece of

damning evidence bears mentioning here, particularly because Defendant never mentioned it in

her Motion or Reply.  On August 13, 2021, law enforcement agents had Gilchrist make a phone

call to Defendant which the agents recorded.  (Doc. 334, pp. 50–54; Gov. Tr. Ex. 47; Gov. Tr.

Ex. 48.)  Gilchrist told Defendant that she had received a call from the SBA that Gilchrist's EIDL

application was being flagged for fraudulent activity.  (Gov. Tr. Ex. 48, pp. 2–3.)  Defendant told

Gilchrist, "I completed [your application] as though I was you."  (Id. at p. 3.)  Defendant conveyed

that she had completed loan applications for other individuals and stated, "they didn't call me

about any of the ones I've done.  You're – you're the first person telling me that."  (Id.)  When

Gilchrist told Defendant that the SBA stressed that Gilchrist's loan application claimed a false

income amount of $330,000, Defendant did not disagree or even express surprise.  (Id. at pp. 5–

6.)  Rather, Defendant told Gilchrist, "**That's the number - - just so you know, Courtney, that's

the number we had to put down to get to the 150**."  (Id. at p. 6 (emphasis supplied).)  This

statement sinks Defendant's claim that she was an unknowing conduit of information that Gilchrist

and Parker gave her.  After all, Defendant told Gilchrist the rationale behind the application's

falsified income amount.  Defendant confirmed that she had controlled Gilchrist's application's

falsities when she told Gilchrist, "[t]hat's why I kept telling you, I'm going to - - I'm going to be

---

[9]  The fabricator also changed the account number on the first two pages of EZ Legal Solutions' fabricated
statement but then failed to do so on the last two pages.  (See Gov. Tr. Ex. 58, pp. 25–28.)

doing some stuff to get you this money.  So it wasn't nothing - - it wasn't nothing crazy.  All we did was give them your taxes, and then we - - I didn't do anything different from yours than I did for mine, Courtney."  (Id. at p. 7.)  Defendant tried to calm Gilchrist with assurances that revealed not only Defendant's knowledge of the fraud but also her lack of credibility.  (Id. at pp. 7–10.)  She told Gilchrist, "[i]f we have to come up with a story, I'm gone [sic] help you come up with a story because I've got the same amount to lose as you do, okay?  We [sic] in this together."  (Id. at pp. 9–10.)

Given the bounty of incriminating proof, it is galling for Defendant to claim that she was unaware of the falsehoods in the loan applications and supporting materials.  Then again, given her statements, it is unsurprising that Defendant has "come up with a story" when faced with the consequences of her crimes.

## II.     The Jury Heard Ample Evidence of Defendant's Participation in the Conspiracy.

The Court also rejects Defendant's argument that the Government failed to prove she was "the individual behind the keyboard and submitting online documentation."  (Doc. 356, p. 9.)  Defendant misapprehends the Government's burden.  As explained by the agreed upon jury charges, to prove Defendant guilty of conspiracy to commit wire fraud, the Government "doesn't have to prove . . . that the Defendant personally made the transmission over the wire."  (Doc. 336, p. 261.)  Even if the Government had to prove that Defendant was the "individual behind the keyboard" submitting the false loan applications, it introduced such proof in spades.  For one, Defendant submitted seven applications for her own businesses, six of which were fraudulent and supported by fabricated documents.  Defendant also testified that she filled out and filed Gilchrist's application.  (Doc. 335, p. 186.)  Moreover, loads of evidence connect Defendant to the four fraudulent loan applications that she denies submitting.

## A. Multiple Types of Evidence Connect Defendant to the Fraudulent Loan Applications.

Defendant paints the Government's case against her as a patchwork of proof that requires too many leaps of logic to convict her. (Doc. 356, p. 9 ("The Government failed to make the connection between the fraudulent applications and the identity of the individual transmitting the applications via the internet, and therefore the identity element has not been met.").) In actuality, the Government introduced a wide swath of categories of evidence that inculpated Defendant. The Court lists some of those categories and provides illustrative examples. Once again, the list is not exhaustive. The Court could point to even more categories of evidence and more proof within each of the listed categories connecting Defendant to each of the eleven fraudulent applications.

### 1. Communications with Coconspirators

Defendant was not discreet when communicating with her coconspirators about the fraudulent applications. For instance, on the same day the SBA denied Actually Living Life's EIDL application because the business was "[e]stablished after the disaster," (Gov. Tr. Ex. 54, p. 4), Defendant text messaged Parker, "they declined my person stating that her application indicated it was started after the pandemic." (Gov. Tr. Ex. 46, p. 31.) Defendant texted that the reason for denial was "not true" because "the app says her biz started and ownership as of 1/13/07." (Id.) This was the exact start date on Actually Living Life's application, a detail Defendant would only know if she participated in its submission. (Gov. Tr. Ex. 54, p. 2.) The words "my person" in her message to Parker also indicate that Defendant submitted the application on Smith's behalf.[10] Defendant sent Parker several other messages that reflect Defendant solicited EIDL

---

[10] This evidence proves Defendant lied to the jury when she testified that she was not familiar with Smith's EIDL application, that she knew nothing about it, that she did not submit it, and that she did not "assist Smith in any way in preparing that application." (Doc. 335, pp. 192, 194–95.) During cross-examination, Defendant stood by the answers she gave on direct examination, but—perhaps realizing the inconsistency

applicants and submitted their loan applications.  For instance, Defendant asked for "the text," and Parker responded with a text that Defendant sent to solicit EIDL applicants.[11]  (Compare Gov. Tr. Ex. 46, p. 19 with Gov. Tr. Ex. 43, p. 2; see also Gov. Tr. Ex. 46, p. 21 ("[G]ot one client at 10K. His app went thru pretty quick [sic] and he got approved but im [sic] waiting on the loan closing docs."); id. at p. 26 ("Girl my people still have not gotten their loan closing documents yet"); id. at p. 28 ("Girl have [sic] the sba been requesting additional information from ur [sic] clients for the eidl?"); id. at p. 30 ("I got [sic] six to do this weekend.  I'm just gone [sic] do them and see what happens"); id. at p. 31 ("Girl!!!! EIDL is tripping!!! Did yours go through?").)

## 2.    Records of Email Accounts

The jury heard evidence that Defendant typically created an email account for an applicant business shortly before submitting the business's EIDL application and that she then used that account to communicate with the SBA on behalf of the applicant.  For instance, Kenneth Jackson's application listed an email address of kj119582@gmail.com.  (Gov. Tr. Ex. 29, p. 11.)  This email account was created on the same day that Jackson's EIDL application was submitted.  (See id.; Gov. Tr. Ex. 36, p. 1; doc. 334, pp. 57–58.)  The creator of the kj119582@gmail.com email account listed shaqwb@gmail.com as the recovery account to access the account if the account holder was locked out.  (Gov. Tr. Ex. 36, p. 1; doc. 334, p. 59.)  Defendant admitted that shaqwb@gmail.com is one of her email accounts.  (Doc. 336, pp. 47, 56.)  The records for kj119582@gmail.com also show that the account was linked to other accounts associated with Defendant and email accounts listed on other fraudulent loan applications.  (Gov. Tr. Ex. 36, p. 2; Doc. 334, p. 60.)  Electronic

---

between her testimony and her text messages to Parker—she essentially feigned amnesia, even claiming at times that she did not recall counsel's questions asked moments before.  (Doc. 336, pp. 21–26.)

[11] Tellingly, this solicitation text did not ask for the applicant business's revenue.  This further proves that Defendant and her coconspirators falsified the revenue amount to get the largest loan available.

markers also linked another of Defendant's email accounts, s.a.woodslaw@gmail.com, to the accounts listed on Gilchrist's, D'Evils', and COVID Trucking's applications.  (Doc. 334, p. 62.)

### 3.   Fund Transfers to Coconspirators

Defendant transferred funds to her coconspirators close in time to their assistance with her fraudulent loan submissions.  She was careless when it came to concealing these transactions.  For instance, on July 30, 2020, Childers created a fraudulent Form 1099 for Kenneth Jackson's EIDL application and emailed it to kj119582@gmail.com.  (Gov. Tr. Ex. 31.)   On that same date, Defendant paid Childers $100 via CashApp with a memo that described the subject of the transaction as "**KJ 1099**."  (Gov. Tr. Ex. 34, p. 2 (emphasis supplied).)[12]

### 4.   Similarities in Applications

The five EIDL applications that Defendant concedes she submitted and the four applications that she disavows contain conspicuous similarities.  For instance, EZ Legal Solutions' EIDL Application, which Defendant admits she submitted, lists a primary business address of "5501 Wesconnectt-unit 7115" in Jacksonville, Florida.  (Gov. Tr. Ex. 5, p. 1.)  COVID Trucking's application, which Defendant claims she had nothing to do with, lists a primary business address of "5501 Wesconnectt-unit 7474" in Jacksonville.  (Gov. Tr. Ex. 16, p. 1.)  Actually Living Life's Application, which Defendant also disavows, lists an address of "5501 Wesconnett Blvd. Suite 14299" in Jacksonville.  (Gov. Tr. Ex. 54, p. 1.)[13]

---

[12]  Given this evidence, defense counsel cannot credibly argue that "there is no extrinsic evidence to support Ms. Childers' assertion that Ms. Woods directed her to alter documents, or that Ms. Woods was even aware of Ms. Childers' fraudulent actions." (Doc. 368, p. 5.)  Defense counsel owes Defendant a duty of zealous representation, and the Court understands that it is not easy to represent a client convicted by overwhelming evidence.  That said, counsel owes this Court an overriding duty of candor.  It is one thing to ignore or minimize incriminating evidence.  It is another to misrepresent the record and claim the evidence does not exist.  Counsel crossed that line multiple times in Defendant's supporting brief and Response.  The Court trusts counsel will not make similar specious arguments again.

[13]  EZ Legal Solutions' and COVID Trucking's applications spelled this location as "Wesconnectt," (Gov. Tr. Ex. 5, p. 1; Gov. Tr. Ex. 16, p. 1), and Actually Living Life's application spelled it as "Wesconnett,"

### 5.      Electronic Identifiers

The jury also saw compelling electronic evidence tying the four loan applications Defendant disavowed to the eight applications she admitted submitting.  For instance, Agent Lott testified that Defendant's EIDL application for EZ Legal Solutions was linked to other applicant businesses by her home's internet protocol address ("IP address").  (Doc. 333, pp. 154—56; see also, Gov. Tr. Ex. 5, pp. 94—95.)  Lott explained that an IP address identifies and tracks activity on the internet from a certain location.  (Doc. 333, pp. 153—55.)  He testified that an IP address can be static or dynamic and that dynamic addresses are more likely to change over time.  (Id. at p. 154.)  While the IP address at Defendant's home periodically changed, applications submitted close in time from her home revealed they were submitted from the same location.  Actually Living Life's and D'Evils Limited's EIDL applications were sent from the same location in Jacksonville, Florida even though the businesses' owners, Smith and Coleman respectively, live in different states.  (Gov. Tr. Ex. 54, p. 1; Gov. Tr. Ex.60 p. 1; doc. 333, p. 181.)  Courtney Gilchrist's application, which Defendant admits to submitting, and Kenneth Jackson's application, which Defendant disavows, also shared an IP address.  (Gov. Tr. Ex. 29, p. 1; Gov. Tr. Ex. 37 p. 1.)

### 6.      Coconspirator Testimony.

Gilchrist, Smith, Parker, and Childers each testified to their agreement with Defendant to make false representations to the SBA.  These coconspirators explained that Defendant not only submitted lies for her own businesses' applications but also that she was "the individual behind

---

(Gov. Tr. Ex. 54, p. 1).  This street address is the location of a United States Post Office and the "units" on the applications were post office boxes.  (See, Gov. Tr. Ex. 17; Gov. Tr. Ex. 55.)  Smith testified that Defendant had her obtain a post office box at this location for Actually Living Life's EIDL application.  (Doc. 334, pp. 27–28.)  Defendant apparently placed the street address and "unit number" on the applications to dodge the EIDL application form's direction, "Primary Business (Cannot be a P.O. Box)." (Gov. Tr. Ex. 5, p. 1).

the keyboard" as to others' fraudulent applications.  Defendant cannot believably deny that these witnesses provided sufficient testimony to convict her.  Thus, she attacks their credibility.  The Court rejects that argument in Section III below.

**B.    Multiple Layers of Evidence Connect Defendant to Each Loan Application.**

Not only did the evidence against Defendant span a broad spectrum of categories, the layers of evidence as to each loan application piled deeply.  For instance, though Defendant told the jury that she did not "participate in any way with the application submitted for COVID Trucking," (doc. 335, pp. 185–86), that application was covered in Defendant's figurative fingerprints.  The Court summarizes some of that proof below.  Yet again, the Court's summary does not include all the proof connecting Defendant to the loan applications.  The Court could recount even more incriminating proof connecting Defendant to the EIDL application of COVID Trucking, the business owned by her husband Quentin Bostick, Sr. and just as many layers of proof connecting Defendant to the other applicant businesses' fraudulent representations.

The evidence of Defendant's connection to COVID Trucking's fraud begins with the face of the business's EIDL application.  The application listed a phone number ending in "7321," (Gov. Tr. Ex. 16, p. 2), the same phone number on Defendant's EIDL application for S.A. Woods Law, (Gov. Tr. Ex. 2, p. 2).  During the SBA's investigation, Agent Lott dialed the phone number, and a female answered and identified the business as S.A. Woods Law.  (Doc. 333, p. 235.) COVID Trucking's application also listed a bank account that did not belong to Defendant's husband (the supposed owner of COVID Trucking), but to Defendant and her son.  (See Gov. Tr. Ex. 16, p. 3; Gov. Tr. Ex. 25, pp. 45–49.)  Even more damning, the day the SBA deposited COVID Trucking's EIDL proceeds into Defendant and her son's joint account, Defendant transferred the

funds into a bank account which she solely held.  (Gov. Tr. Ex. 25, p. 48; doc. 335, p. 185; doc. 336, pp. 74–76.)

The layers of evidence connecting Defendant to COVID Trucking's EIDL application piled even deeper.  On January 16, 2021, Defendant sent multiple emails to Parker from one of Defendant's email accounts, s.a.woodslaw@gmail.com.  (Gov. Tr. Ex. 12; Gov. Tr. Ex. 23; Gov. Tr. Ex. 26; Gov. Tr. Ex. 27.)  In the emails, Defendant listed names and addresses for various applicant businesses, and she attached bank statements, not for accounts belonging to the businesses listed in the emails, but for accounts belonging to Defendant and her law firm.  (Gov. Tr. Ex. 12; Gov. Tr. Ex. 23; Gov. Tr. Ex. 26; Gov. Tr. Ex. 27.)  One of Defendant's emails listed the name "COVID Trucking, LLC," and the address "5501 Wesconnett-Unit 7474."  (Gov. Tr. Ex. 23.)[14]  Defendant sent text messages to Parker on the same day confirming that she sent the emails, that 7474 was "Quentin's . . . unit number" and asking if Parker would "be available to process Quentin [sic] statements today?"  (Gov. Tr. Ex. 46, p. 32, 33.)  Parker emailed Defendant back a bank statement for COVID Trucking, which included the address and unit number that Defendant had emailed and texted.  (Gov. Tr. Ex. 23, pp. 7–12.)  Other than the business name and address, COVID Trucking's fabricated bank statement was identical to Defendant's law firm's legitimate bank statement which Defendant had emailed to Parker.  (Compare id. with Gov. Tr. Ex. 27, pp. 15–20.)[15]

---

[14]  As noted above, this address was the same, except for unit number, as the address Defendant listed on her EIDL application for EZ Legal Solutions.

[15]  These emails, text messages, and attachments belie Defendant's assertion that "[a]t no point was there any documentary evidence introduced at trial that Ms. Woods requested Ms. Parker alter any of the bank statements" and that "Ms. Parker's self-serving testimony is the only indication that Ms. Woods requested the documents be altered."  (Doc. 368, p. 4.)  Again, the Court is disappointed in defense counsel's misrepresentations.

The layers of proof of Defendant's involvement in COVID Trucking's sham EIDL application extend even beyond information on the face of the application, the deposit of funds into Defendant's bank account, Defendant's communications with Parker, and the creation of fraudulent bank records using Defendant's account statements. The SBA flagged COVID Trucking's application because the "account ownership" was "incorrect."[16] (Gov. Tr. Ex. 16, p. 7.) Eventually the SBA approved the loan after receiving an IRS Form 1099 on July 3, 2020, for tax year 2019 showing that COVID Trucking, LLC, paid Quintin Bostick $325,000. (Id. at pp. 6–7, 9; Gov. Tr. Ex. 24.) Unsurprisingly, Bostick's legitimate tax records show that he was not paid a third of a million dollars by a company named "COVID Trucking, LLC," in 2019. (Gov. Tr. Ex. 18.) Rather, he only claimed $56,717 in salary as an employee of Home Depot that year. (Id.) Moreover, though the 1099 was supposedly for 2019, it listed COVID Trucking's address as a post office box that Bostick did not create until April 29, 2020.[17] (Gov. Tr. Ex. 17.) Thus, COVID Trucking's 1099 was phony, and the jury heard plenty of evidence that Defendant commissioned and submitted it. For one, Childers testified that she created the sham document for Defendant at Defendant's request. (Doc. 334, pp. 251–52.) Additionally, the day before the phony 1099 was emailed to the SBA, Defendant paid Childers $100 and described the subject of the payment as "1099." (Gov. Tr. Ex. 34, p. 2.) Given the timing and surrounding evidence, any reasonable juror would conclude that Defendant paid Childers for COVID Trucking's bogus 1099.

---

[16]  It is maddening that the SBA did not flag the application because it claimed that a business named "COVID Trucking, LLC," had been formed almost two decades before the COVID-19 pandemic began.

[17]  Quentin Bostick, Sr., apparently applied for this post office box, as it required a photo identification. (See Gov. Tr. Ex. 17.) Tellingly, the post office box application listed a different email account than the account listed on COVID Trucking's EIDL application and which Defendant used to communicate with the SBA on behalf of COVID Trucking. (Compare id. at p. 1; Gov. Tr. Ex. 16, p. 1 with Gov. Tr. Ex. 24.) Likewise, Smith listed her actual email address on the post office application for Actually Living Life, whereas Defendant listed a different email address on the company's EIDL application. (Compare Gov. Tr. Ex. 55, p. 1 with Gov. Ex. 54, p. 2; see also, doc. 334, pp. 26–28.)

Put simply, the Government produced sufficient proof that Defendant agreed with her coconspirators to make materially false representations to the SBA in support of EIDL and PPP loan applications.  The Government did not need to prove Defendant was the "individual behind the keyboard" submitting misrepresentations.  Nonetheless, it introduced abundant categories of evidence to that point and multiple layers of evidence of Defendant's connection with each applicant businesses' fraudulent misrepresentations.

### III.   Defendant's Attacks on the Credibility of the Government's Witnesses are Misplaced and Unavailing.

Throughout her Motion and Reply, Defendant challenges the credibility of her coconspirators' testimony.  (See doc. 356, p. 11 ("Ms. Gilchrist's testimony was unreliable and internally inconsistent."); id. at p. 13 ("Ms. Childers' testimony should be completely discounted as unreliable, self-contradictory, and self-serving.  . . . Ms. Parker's testimony was not credible as it was self-serving and unsupported."); id. at p. 14 ("Because all the cooperating witness's [sic] testimony at trial was contradictory, unreliable, and self-serving, the weight of the evidence does not support Ms. Woods's conviction."); doc. 368, p. 6 ("Each of the above cooperating Government witnesses (Ms. Gilchrist, Ms. Parker, and Ms. Childers) have significant motive to implicate Ms. Woods to improve their standing in the eyes of the Government.").)  The Court rejects Defendant's contentions.

Credibility determinations are typically left to the jury.  In considering Defendant's request for a judgment of acquittal, the Court must draw all "credibility choices in favor of the jury's verdict."  O'Keefe, 825 F.2d at 319.  To be sure, when considering Defendant's request for a new trial, the Court may consider witness credibility.  Martinez, 763 F.2d at 1312.  Yet "[c]ourts have granted new trial motions on weight of the evidence only where the credibility of the government's

witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies." Id. at 1313.  This case does not fit that description.

Defendant's primary credibility argument boils down to a contention that her coconspirators were motivated to testify against her to receive leniency as to the charges pending against them.  As one court has explained, "this fact, which is present in many cases involving codefendant testimony, does not establish that a new trial is appropriate.  It does, however, contextualize the court's assessment of the credibility of these witnesses." United States v. Carter, 614 F. Supp. 3d 1081, 1104 (M.D. Ala. 2022).  It is also unremarkable but not overlooked by the Court that Defendant's coconspirators engaged in fraud themselves and denied or minimized their and Defendant's culpability when first questioned by agents.  The Court is not surprised that individuals who conspired with Defendant to defraud the Federal Government would continue to lie to the Government until they realized the futility of their deception.  All the same, the jurors knew of the coconspirators' biases, criminality, and prior inconsistent statements and evidently found them to be credible witnesses all the same.

The Court sees no reason to disturb the jury's credibility judgment.  To the contrary, the Court observed the cooperating witnesses testify and found them to be remarkably credible. Gilchrist appeared truly remorseful for her involvement and seemed heartbroken to testify against her former friend.  Smith, Childers, and Parker did not exhibit the same emotion as Gilchrist, but they testified forthrightly, acknowledged their own wrongdoing, and explained Defendant's role in the conspiracy without embellishment.  The coconspirators' testimony also lined up with the documentary evidence and the law enforcement agents' testimony.

In contrast, Defendant was the second-least credible witness the Undersigned has ever encountered.  She struggled to answer basic questions, tried to evade straightforward inquiries,

repeatedly contradicted herself and the documents of record, claimed to have forgotten questions that were asked moments before, stammered through answers that made no sense, and doubled down on her lies when confronted with proof of their falsity. She appeared to be trying to recount a fictional tale that she had written and rehearsed but failed to memorize. The Court would not trust Defendant to tell the truth about the time of day.

Moreover, regardless of whether the cooperating witnesses' testimony was impeached, the Government's case against Defendant was not marked by uncertainties and discrepancies. As summarized above, the Government introduced plentiful proof of Defendant's poorly hidden criminal scheme. The jury saw and heard fifty-five damning exhibits including the recorded phone call during which Defendant admitted to submitting false information, explained the reasoning behind her deceit, and committed to "come up with a story" to cover her and her coconspirator's tracks. Consequently, Defendant's argument "[t]here is no documentary or extrinsic evidence to show Ms. Woods was aware of a conspiracy to commit wire fraud or that she requested or directed anyone to create fraudulent information to submit with any EIDL or PPP loan" misrepresents the record.[18]

---

[18] This is yet another specious representation by defense counsel. Additionally, counsel's assertions about the substance of the coconspirators' testimony troubles the Court. For instance, Defendant's brief argues that "none of the witnesses testified to an agreement with [Defendant] to obtain EIDL loans via falsified documents." (Doc. 356, p. 9.) This is an odd contention given that in the Factual and Procedural Background section of the same pleading, Defendant acknowledges, "[t]he Government also called a number of witnesses who testified they engaged in fraud in concert with Ms. Woods." (Id. at p. 3.) More to the point, the Background section accurately stated that "Ms. Childers admitted to creating false tax returns for Kenneth Jackson to submit along with his EIDL and PPP loan applications. . . . Ms. Childers claimed Ms. Woods requested these falsified tax returns and paid her via CashApp in exchange for the altered tax returns." (Id. at p. 4.) Defendant also acknowledged that Parker "testified that she created false bank statements and tax returns at the behest of Ms. Woods." (Id.) On this point and others, Defendant's brief reads as though the writer of the Law and Argument section did not write—or read—the Factual and Procedural Background section.

**IV.     Defendant's Repayment of Ill-Gotten Loan Proceeds Does Not Reverse her Fraud**.

Defendant argues that the jury could not have found that she had a specific intent to defraud the SBA because she "never used the money received from the EIDL loans and returned it in full at the advice of counsel." (Doc. 356, p. 15.)  Defendant's return of the EIDL proceeds hurts her case more than it helps.  For one, Defendant's possession of the loan proceeds further confirms her involvement in the loan applications.  Additionally, the fact that Defendant did not use the money to assist her putative businesses during the pandemic—after all, that was the aim of the EIDL program—supports the Government's theory that she had no legitimate ongoing businesses into which she could have invested the funds.  Furthermore, when thieves return stolen money, their earlier thefts are not legalized or immunized.  Particularly as to the charge here, "financial loss is not at the core of . . . wire frauds.  Instead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit."  United States v. Maxwell, 579 F.3d 1282, 1302 (11th Cir. 2009) (rejecting defendant's sufficiency of the evidence argument where Defendant contended United States and county received contracted services and thus suffered no loss); see also United States v. Foster, No. 13-20063-CR, 2014 WL 12687616, at *7 (S.D. Fla. Mar. 31, 2014) (rejecting defendants' Rule 29 challenge to conspiracy to commit wire fraud conviction where defendants argued victims suffered no harm because conspirators paid back loans and noting that "'wire fraud statutes do not focus on the victim's actual loss but on the defendant's intent to obtain money or property by means of fraud or deceit.'") (quoting United States v. Artuso, 482 F. App'x 398, 402–03 (11th Cir. 2012)).

The evidence also belies Defendant's attempt to spin her return of the EIDL proceeds as exculpatory of mens rea.  She claims that "she did not have the specific intent of defrauding the SBA for personal gain, as she held the money and never used it on anything, much less personal

expenses." (Doc. 356, p. 15.) Yet as discussed with her coconspirator Parker, Defendant planned to "sit the money" in her personal bank account until she "submit[ted] the forgiveness paperwork and see the amount they forgive." (Gov. Tr. Ex. 46, p. 9.) When questioned about this statement at trial, Defendant admitted that she intended to hold onto the EIDL proceeds until she saw how much of the loans the SBA would forgive. (Doc. 336, p. 145.) Thus, Defendant was no better at concealing her nefarious motives than she was at concealing her deceit. She fully intended to use the fraudulently obtained funds for her "personal gain" once she knew how much of those funds the SBA would allow her to keep without repayment. Defendant did not pay back the loans due to a change of heart or benevolent motive but, rather, because federal law enforcement agents were investigating her. (Id. at pp. 148–50.)

Defendant also sought "personal gain" by charging others a fee for submitting their loan applications. She discussed a 10% fee with her coconspirator Parker, and she told Parker that she "got one client at 10K." (Gov. Tr. Ex. 46, pp. 19, 21.) Defendant later messaged about how she would get paid once a client's loan was funded and that Defendant planned to "debit her account as soon as I find out its [sic] in there." (Id. at p. 25.) This individual appears to have been Gilchrist as Defendant later told Parker, "her bank keeps blocking my withdraw [sic]" and that Defendant was going to pick up the payment in Brunswick, Georgia, where Gilchrist lived. (Id. at p. 29.) When Gilchrist made the recorded phone call to Defendant about the EIDL application, Defendant assured her, "[a]nd if you have to ever give any money back, Courtney, I'll give you back that 10,000." (Gov. Tr. Ex. 48, p. 5.)[19]

---

[19]  Defendant claimed that Gilchrist paid her $10,000 for a "Google Drive" containing documents to help Gilchrist start her law firm. (Doc. 336, p. 206; id. at p. 98.) She stands by this claim in her supporting brief. (Doc. 356, p. 12 ("Ms. Woods provided an innocent explanation for the payment to Ms. Gilchrist, as Ms. Woods provided her with processes and forms for her law firm.").) Defendant's communications with Parker, the context of her statements to Gilchrist, other damning evidence, and basic common sense, belie Defendant's explanation. Even if Defendant's explanation was credible, it would further incriminate her.

Thus, like all of her arguments, Defendant's contention that her conviction should be vacated because she paid back the funds she fraudulently obtained does not withstand a passing examination of the law and facts.

**CONCLUSION**

For the above stated reasons, the Court **DENIES** Defendant Shaquandra Woods' Motion Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure to Vacate Defendant's Conviction.  (Doc. 356.)

**SO ORDERED**, this 29th day of March, 2024.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

If Defendant was selling documents to Gilchrist to help Gilchrist start a law practice, Defendant knew that the law practice did not make over $300,000 the previous year as Defendant stated on Gilchrist's EIDL application.